UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MABIOR JOK,                        )
                                   )
          Plaintiff,               )
                                   )
          v.                       )      Case No. 2:19-cv-70
                                   )
CITY OF BURLINGTON, VERMONT,       )
BRANDON DEL POZO, JASON            )
BELLAVANCE, JOSEPH CORROW,         )
and JANINE WRIGHT,                 )
                                   )
          Defendants.              )

**OPINION AND ORDER**

Plaintiff Mabior Jok brings this action alleging that

Officer Joseph Corrow used excessive force in violation of his

constitutional rights. Plaintiff also brings Vermont state law

claims of battery, assault, intentional infliction of emotional

distress, and gross negligence against Officer Corrow.

Additionally, Plaintiff alleges that Defendant City of

Burlington, as well as former Chief of Police for the City of

Burlington Brandon Del Pozo, former Deputy Chief of Police

Janine Wright, and Sergeant Jason Bellavance, allowed a pattern

and practice of failing to train, supervise and discipline

officers, that amounted to negligence under Vermont state law

and deliberate indifference to Plaintiff's rights under the

Fourth and Fourteenth Amendments.

1

Defendants now move for summary judgment, arguing that there was no unlawful conduct and that the individual Defendants are entitled to qualified immunity. Plaintiff opposes the motion, arguing that genuine issues of material fact preclude dismissal of his claims as a matter of law. For the reasons set forth below, Defendants' motion for summary judgment is **granted in part and denied in part**.

**Factual Background**

Jok is an immigrant who came to the United States after fleeing his home country of Sudan. In Sudan, he was forced into combat as a child soldier, suffered a lack of basic food necessities as a refugee, and watched his closest family members, including his father, die. He currently suffers from post-traumatic stress disorder ("PTSD"), symptoms of which include flashbacks to those past experiences.

Defendants assert that Jok's PTSD is triggered by people in uniform. Jok testified in his deposition that people in uniform remind him of the people who killed his father but denies having issues with all uniformed people. Jok also testified that incidents of violence can trigger flashbacks. To soothe his mental pain, Jok sometimes self-medicates with alcohol.

At approximately 1:45 a.m. on September 8, 2018, Jok was standing with a group of people smoking cigarettes outside R.J.'s, a Burlington, Vermont bar. The conversation among the

group became tense. Defendant Joseph Corrow, a Burlington police officer who was on patrol in the immediate area, arrived on the scene. An exchange then occurred between Jok and Corrow which culminated in Officer Corrow deploying an "arm takedown," a maneuver used to bring a person to the ground. Jok hit the ground and lost consciousness.

Jok's next memory is waking up in the hospital. He was cited and ultimately charged with disorderly conduct. The charge was later dismissed by the State.

After the September 8, 2018 incident, the Burlington Police Department (the "Department") conducted an internal investigation to determine whether Officer Corrow violated its use of force policy. The investigation addressed three issues: (1) whether Officer Corrow's use of force against Jok was unnecessary; (2) whether his use of force was excessive or unreasonably departed from the expectations of his training; and (3) whether his tactics departed from the expectations of his training in a way that did not minimize risks to his safety. The investigation concluded that Officer Corrow's use of force was "lawful and proper," and that the force used did not depart from his training and the Department's expectations. The investigation also concluded, however, that Officer Corrow did not take sufficient steps to minimize the risks to himself by calling for backup prior to approaching the group.

3

The following facts remain currently disputed between the parties:

1. It is disputed what occurred as Officer Corrow approached the scene. Officer Corrow claims that he saw a group of people standing with Jok, many of whom were yelling at each other. He then reportedly saw Jok strike another man in the face with a closed fist. Defendants argue that Officer Corrow approached Jok and tried to handcuff him, but Jok raised his arms. Fearing that Jok was about to assault him, Officer Corrow allegedly administered a modified arm bar takedown. Upon being taken down, Jok lost consciousness. Officer Corrow and Sergeant Jason Bellavance placed Jok in a recovery position and called the Burlington Fire Department. Defendants' memorandum submits that the punch is captured on Officer Corrow's body camera, yet Officer Corrow testified that the alleged punch was outside the video's field of view. Jok denies hitting anyone. Jok also denies raising his arms, claiming that he did not have time to react or resist prior to being taken down by Officer Corrow. *See* Pls. Ex. 1. Jok disputes that Officer Corrow tried to handcuff and arrest him before using force. Instead, Plaintiff alleges that Officer Corrow made no attempt to arrest him and immediately used force. *See* Pls. Ex. 12.1 at 2-4. Jok further contends that after Officer Corrow slammed him to the pavement, Defendants left him face down and bleeding for over one minute.

4

Witnesses from the night give conflicting testimony on what happened. Some witnesses say that Jok punched a man and others say that he was trying to break up a fight. Thomas Everton was working security at R.J.'s Bar that evening and reported in his deposition that "Jok came through the crowd during the engagement between these two people and decided to either hit or attempt to hit." *See* Pls. Ex. 13 at 13:5-12. Another witness, Alex Komeyan, stated that Plaintiff was not involved in a physical fight, but rather a verbal exchange which he referred to as "friendly." *See* Pls. Ex. 10 at 42:7-25. Witness Ajeing Dau also testified that Plaintiff did not punch anyone. *See* Pls. Ex. 14 at 48:17-25. In an email to Janine Wright, Sergeant Bellavance wrote that he "spoke with several people on scene who made allegations that Corrow 'slammed' Jok to the ground for no reason. Not one of these people claimed to have witnessed Jok assault the male prior . . . ." *See* Pls. Ex. 53.

Upon reviewing the video evidence,[1] the Court concludes that a reasonable interpretation of the bodycam footage is that Jok did not appear to be the aggressor in a fight nor was he about to strike Officer Corrow, and that force was used by Officer Corrow immediately without any verbal command or warning.

---

[1] *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (holding that a court can, based on its interpretation of a video evidence, view "the facts in the light depicted by the videotape").

2. The level of aggression displayed by the group as Officer Corrow approached is also disputed. Relying on witness testimony by Jacob Garrett, Defendants describe a group that had become increasingly aggressive, yelling obscenities at one another. They were drunk and angry. *See* Defs. Ex. E at 36:7-20. Plaintiff alleges that to the contrary, things had calmed down by the time Officer Corrow approached and that plaintiff was not one of the people in the argument when the above-described aggression took place. *See* Pls. Ex. 2.1 at 33:14-16; 45:5-25. Witness Matthew Vince testified that Corrow had "zero knowledge" of what was happening before he "tackle[d]" Jok. *See* Pls. Ex. 7.2. Meanwhile, Officer Corrow testified that as he approached, he understood that Jok and "the person he was fighting" were the only people that posed a risk. *See* Defs. Ex. B at 120:11-18.

3. The identity of the person that Jok allegedly punched is disputed. Several Defendants, including Defendant Bellavance, Defendant Wright, and Defendant's use of force expert, Jack Ryan, all identified "AJ" or "the male in the blue checkered shirt" as the person that Jok punched. *See* Pls. Ex. 52 at 84-85; Pls. Ex 9.2 at 21-23. Bodycam footage from that night shows Sergeant Bellavance asking several witnesses for the name of the person that Jok allegedly hit, and that he is unable to get an answer. *See* Pls. Ex. 55. Meanwhile, witness Alex Komeyan

indicated that the altercation was between Paul Comba and Jok.
*See* Pls. Ex. 10 at 40:14-41:16.

4. It is disputed how much Officer Corrow knew about
Plaintiff prior to the incident on September 8, 2018. Defendants
allege that Jok engaged in violent behavior which made him known
to members of the Burlington Police Department. Plaintiff
disputes this, arguing that while other members of the police
department may know Jok, the relevant individual in this case,
Officer Corrow, did not have specific knowledge of Jok's history
of interactions with the police. Officer Corrow testified that
he could not recall the name of anyone telling him that Jok was
violent, and that prior to September 8, he was not aware that
Jok had ever been charged with resisting arrest or that his name
had ever been flagged in the Department system. *See* Pls. Ex.
1.41 at 78-79, 87-88, 90. Despite not having any specific
knowledge, Officer Corrow testified that he had dealt with Jok
"a bunch." *Id.* at 76:19-21.

5. Some dispute also exists as to what the Burlington
Police Department's internal investigation revealed. Defendants
allege that the investigation found that Officer Corrow's use of
force was not unreasonable, unlawful, or excessive. Jok argues
that the investigation was flawed, insufficient, biased, and did
not comport with Department policy which dictates that internal
investigations should be completed within 30 days of an

incident. Among other things, Plaintiff submits that the
conclusions reached in the investigation were based in part on
misleading information provided by Sergeant Bellavance. Jok also
notes that the investigation was led by then-Deputy Police Chief
Janine Wright. The Second Amended Complaint accuses Defendant
Wright of racial bias.

6. Jok contends that his evidence creates a dispute of fact
on the question of racial bias within the Burlington Police
Department. Defendants argue that there is no evidence of
Department officers using force in a way that was motivated by
racial animus. The summary judgment record includes a report
authored by the City of Burlington concluding that its police
were more likely to draw or point a firearm at a suspect of
color. *See* Pls. Ex. 9 at 25. Then-Chief of Police Brandon Del
Pozo has also acknowledged publicly that the use of force by his
Department had a disproportionate impact on African Americans.
*See* Pls. Ex. 20.2 at 1:02:40. Between 2010 and 2016, Black
people made up 17.81% of the population in use of force
suspects, *See* Pls. Ex. 9 at 12, a much larger percentage than
the percentage of Black citizens in Burlington. Defendants also
argue that there is no evidence that Officer Corrow's actions
were motivated by race. Plaintiff disputes this claim, pointing
to the fact that the Department's Criminal Data Analyst, Nancy
Stetson, wrote in an email to Del Pozo that the Department

conducted 24 vehicle searches in 2018, 12 of which were
performed on Black people; nine of those 12 were conducted by
Officer Corrow. *See* pls. Ex. 4.6. Wright testified in her
deposition that she remembers having a conversation with Del
Pozo about his concerns with the number of Black people Officer
Corrow pulled over. *See* Pls. Ex. 5.01 at 92:3-94:7.

### Procedural History

Plaintiff Mabior Jok filed this lawsuit in federal court on
May 2, 2019. He then submitted a Second Amended Complaint on
August 11, 2020. In that complaint, Jok alleged the intentional
use of excessive force and physical brutality as an illegal and
unreasonable seizure in violation of his Fourth Amendment
rights. He also alleged that Defendant City of Burlington has a
pattern and practice of failing to adequately discipline, train,
supervise and otherwise direct police officers with regard to
knowledge, recognition, and respect of, and for violations of,
the constitutional rights of citizens and persons, which amounts
to deliberate indifference to his Fourth and Fourteenth
Amendment rights. Jok also alleged that Officer Corrow's actions
constituted assault, battery, the intentional infliction of
emotional distress, and gross negligence.

In his second amended complaint, Jok also alleged the
disparate use of police force and escalation of force against
Black citizens. Plaintiff describes a pattern where officers

"identify themselves as law enforcement and issue verbal commands when encountering disorderly situations involving white persons . . . . [versus] officers fail to identify themselves, act aggressively towards and deploy sudden and overwhelming force . . . when encountering disorderly situations involving black persons." ECF no. 121 at 13-14. Plaintiff argues that Defendants Del Pozo, Wright, Bellavance and the City of Burlington allowed a pattern and practice to emerge of disparate use of force against Black citizens in violation of Plaintiff's Fourteenth Amendment rights.

Defendants first moved for summary judgment on April 27, 2020. The Court denied Defendants' motion without prejudice. Defendants moved for summary judgment again on June 15, 2021. Defendants argue that there is no genuine dispute of material fact as to whether their conduct violated Plaintiff's constitutional rights. Additionally, Defendants argue that Officer Corrow used a reasonable amount of force given the circumstances, and that the individual Defendants are entitled to qualified immunity.

Plaintiff opposes the motion for summary judgment, arguing that there is a genuine dispute of material fact as to what happened during his interaction with the Burlington Police Department on the night of September 8, 2018. Furthermore, Plaintiff alleges that there is evidence of disparate use of

force against different racial groups. Plaintiff therefore submits that the questions of whether the use of force violated his constitutional rights and Vermont state law, and whether Defendants Del Pozo, Wright, Bellavance and the City of Burlington allowed a pattern and practice of disparate use of force to prevail within the Department, should be submitted to the jury.

## Discussion

### I.   Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating information presented in summary judgment, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). The burden then shifts to the nonmoving party to demonstrate a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson*, 477 U.S. at 248).

At the summary judgment stage, the inquiry should not be "whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.").

12

## II.  Fourth Amendment Excessive Force Claim

The Fourth Amendment makes it unlawful for a police officer to use "unreasonable and therefore excessive force . . . in the course of effecting an arrest." *See Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). Excessive force claims under the Fourth Amendment are assessed under the "objective reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). The *Graham* factors guide the objective reasonableness inquiry and consider "the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *See Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (citing *Graham*, 490 U.S. at 396). The officer's actions should be judged based on the facts of the situation, "without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Using the *Graham* standard, summary judgment is appropriate only when "no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

Furthermore, when analyzing excessive force claims, courts should look at the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and must make "allowance for the fact that police officers are often forced to make split-second judgments—

13

in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97. The inquiry into whether "the force used . . . is 'reasonable' under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

**A. Jok's Fourth Amendment Claim**

Jok's version of events varies substantially from that of Officer Corrow, creating significant disputes of fact. For summary judgment purposes, a court must view the facts in the light most favorable to the non-moving party. Viewing the facts from Jok's favor, the Court must accept as true that when Officer Corrow arrived on the scene, Jok had not just punched someone and he did not assume a "fighter stance" in preparation to hit Officer Cornrow. Instead, Jok was involved in a verbal disagreement with a group of people outside of R.J.'s bar but gave no indication that he was a threat to the public or that he was about to cause Officer Corrow physical harm. Without inquiring into the situation and without having witnessed Jok

14

assault someone, Officer Corrow used an arm takedown maneuver and threw Jok to the ground, whereupon Jok lost consciousness.

The factual disputes presented by these two versions of events are material. Jok's version of events depicts him having a verbal disagreement with a group of people without risk of escalating violence. Conversely, Defendants argue that Jok inflicted violence on someone else and that Officer Corrow feared that Jok would then hit him.

1. **Severity of the Crime**

In assessing reasonableness, a court should consider the nature and severity of the crime leading to the arrest. *Graham*, 490 U.S. at 396. It is disputed whether Jok assaulted someone outside of the bar. Multiple witness accounts convey different narratives. Accepting Jok's version of events, there was no crime at all. However, even if the Court accepts that Officer Corrow suspected that Jok had hit someone, under Vermont law a person who engages in a "fight or scuffle . . . by mutual consent" is guilty of a misdemeanor punishable by "not more than 60 days" in prison or not more than a $500 fine, or both. 12 V.S.A. § 1023(b). Simple Assault is punishable by up to one year in prison or a fine of not more than $1,000, or both. *Id.* Therefore, although the crime involves violence, it is considered a misdemeanor under local law.

2. **Threat to the Public and the Officer**

In assessing reasonableness, a court is also to consider the risk the arrestee poses to the officer and the public. From Defendants' perspective, Officer Corrow was justified in perceiving the group outside of the bar as a threat, as crowds and situations involving disorderly conduct can pose a threat to officers and public safety. *See Brayshaw v. City of Burlington*, No. 5:13-CV-253, 2015 WL 1523019, at *9 (D. Vt. Apr. 3, 2015); *Cuviello v. Expo,* 2013 WL 3894164, at *6 (E.D. Cal. July 27, 2013)*; see also Gomez v. City of Whittier*, 211 F. App'x 573, 575-76 (9th Cir. 2006) (acknowledging the government's legitimate interest in maintaining the control of the crowd). However, even in situations of disorderly conduct force is not necessarily justified.

In *Brayshaw*, this Court granted the City of Burlington's motion for summary judgment on a Fourth Amendment Excessive Force claim noting that "[p]laintiff continued to physically resist Sergeant Bellavance's efforts to move him away from the crowd and when an unruly crowd began to participate in their exchange, it was objectively reasonable for Officer Bellavance to believe that he had probable cause to arrest Plaintiff for disorderly conduct." 2015 WL 1523019, at *9. This Court further concluded that the use of an arm takedown "was objectively reasonable in light of clear evidence that a mere verbal request

16

would not suffice." *Id.* at *10. This case varies considerably from *Brayshaw*, however. Here, no verbal command was given. Plaintiff was not given any warning that law enforcement was approaching, and he was not given any orders to which he could comply. Instead, viewing the facts in a light most favorable to the non-moving party, Officer Corrow initiated the use of force without identifying himself, asking Plaintiff to do anything, or making any attempt to de-escalate the situation. Because there are genuine issues of material fact in dispute as to the risk posed by Jok to either the police or the public, this *Graham* factor weighs against granting summary judgment.

### 3. **Resisting Arrest**

After reviewing the bodycam footage, the Court concludes that Jok did not resist arrest before Officer Corrow used force against him, as he had not been placed under arrest or given a verbal command.[2] Because Jok's excessive force claim is limited to Officer Corrow's alleged assault, any conduct that occurred after the alleged assault, including resisting arrest, is not relevant to the inquiry. What is relevant to the inquiry is that Jok was not resisting arrest at the time that force was used

---

[2] *See Scott v. Harris*, 550 U.S. at 380-81 (holding that a court can, based on its interpretation of a video evidence, view "the facts in the light depicted by the videotape").

against him. Therefore, this *Graham* factor also weighs against granting summary judgment.

### 4. **Constitutional Violation**

In sum, it is disputed whether Officer Corrow was immediately in danger, or if Jok had just assaulted someone. It is undisputed that Officer Corrow used force without first issuing a verbal warning. The Supreme Court has acknowledged that there is no "easy-to-apply legal test in the Fourth Amendment context [and that] . . . we must still slosh our way through the factbound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383. A question arises as to whether a reasonable officer would have believed that Jok posed an immediate threat to the safety of others such that the use of force was warranted.

*In Crowell v. Kirkpatrick*, this Court granted summary judgment in an excessive force case. 667 F. Supp. 2d 391, 408 (D. Vt. 2009). In doing so this Court relied specifically on the fact that: "(1) the Plaintiffs remained in control of the situation the entire time, and could have avoided the use of force entirely by simply complying with a lawful order; [and] (2) the Defendants gradually progressed through varying degrees of lesser force before deciding to use their Tasers; . . ." *Id.* None of those same factors exist here. Officer Corrow did not give Jok the opportunity to avoid force. Officer Corrow did not

even identify himself before using force. Furthermore, there was no gradual progression of force. Instead, Officer Corrow approached and immediately made forceful physical contact.

The Court cannot conclude at this stage that no reasonable juror could find that Officer Corrow's actions in this case constituted excessive force in violation of Jok's Fourth Amendment rights.

**B. Qualified Immunity**

Officer Corrow has also moved for summary judgment on the basis of qualified immunity. Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In deciding a government official's qualified immunity claim on summary judgment, a court must consider (1) "whether the facts shown 'make out a violation of a constitutional right'"; and (2) "'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson*, 555 U.S. at 232). A right is considered "clearly established" when "[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing

violates that right." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

For the reasons set forth above, a reasonable juror could conclude that Officer Corrow violated Jok's Fourth Amendment rights. The inquiry therefore shifts to whether Jok's right was clearly established. While "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," *Saucier v. Katz*, 533 U.S. 194, 202 (2001), police officers can nevertheless "be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Terebesi v. Torreso*, 764 F.3d 217, 237 (2d Cir. 2014)("An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.")(quotation marks omitted)(quoting *Mendoza v. Block,* 27 F.3d 1357, 1362 (9th Cir.1994)). When determining if a law is clearly established, courts should consider "the specificity with which the right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi*, 764 F.3d at 231. Furthermore, the law can be considered clearly established even in the absence of case law in the relevant circuit if decisions

from other circuits "clearly foreshadow a particular ruling on
the issue." *Id.* (quotation marks omitted) (quoting *Varrone v.
Bilotti,* 123 F.3d 75, 79 (2d Cir. 1997)).

Taking the facts in the light most favorable to Plaintiff,
it is clearly established law that a reasonable officer would
know the type of force inflicted on Jok violated his
constitutional rights. The Second Circuit has held that it is a
clearly established violation of the Fourth Amendment for a
police officer to use considerable force against an unresisting
detainee who poses no threat to officers or public safety. *See
Tracy*, 623 F.3d at 98-99. The Second Circuit has also held that
it is clearly unconstitutional for an officer to strike a person
who is complying with commands and not posing a risk to public
safety. *See Rogoz v. City of Hartford,* 796 F.3d 236, 247-48, 251
(2d Cir. 2015) (denying summary judgment on the basis of
qualified immunity when the officer jumped on a compliant
subject's back while he was prone on the ground).

In the current case, Jok had not been placed under arrest,
nor had he been given any orders by Officer Corrow. Therefore,
it cannot be said that he was resisting arrest or not complying.
*See King v. United States*, 917 F.3d 409, 431 (6th Cir. 2019)
("It is impossible to resist an arrest (or detention) without
knowing that an arrest (or detention) is being attempted.").
Furthermore, the Second Circuit and a number of other circuits

have held that using "arm takedowns" and other maneuvers to take
a person to the ground, including pushes and shoves, without
cause violates clearly established law. *See, e.g.*, *Jones v.
Parmley*, 465 F.3d 46, 63 (2d Cir. 2006)("Our review of the
record shows that each plaintiff who has brought an excessive
force claim has alleged sufficient facts from which a reasonable
factfinder could find that the NYSP employed excessive force . .
. . [f]or example, plaintiffs allege that without provocation,
the NYSP threw several plaintiffs to the ground . . . ."); *see
also Ciolino v. Gikas,* 861 F.3d 296, 303-04 (1st Cir. 2017)
(police officer's forceful takedown of plaintiff arrestee
violated clearly established law where arrestee was not given a
chance to submit peacefully to arrest); *Montoya v. City of
Flandreau*, 669 F.3d 867, 873 (8th Cir. 2012) ("[T]he contours of
the right at issue were sufficiently clear to inform a
reasonable officer in . . . [the Defendant's] position it was
unlawful for him to perform a 'leg sweep' and throw to the
ground a nonviolent, suspected misdemeanant who was not
threatening anyone, was not actively resisting arrest, and was
not attempting to flee."). As the Sixth Circuit recently made
clear, "[a]ssaulting an unarmed and compliant individual has
been a clearly established violation of the Fourth Amendment for
decades." *Butler v. City of Detroit*, 936 F.3d 410, 425 (6th Cir.
2019) (denying qualified immunity and finding an officer's

slamming of an arrestee into a wall violated clearly established federal law); *see, e.g., Stanfield v. City of Lima*, 727 F. App'x 841, 848 (6th Cir. 2018)(holding that a "takedown" in which was police officer shoved an arrestee from behind and tripped him was objectively unreasonable and violated arrestee's constitutional rights); *McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (denying qualified immunity for a police officer who used a leg sweep to take down an arrestee who "jerked away" but otherwise was not resisting arrest); *Burden v. Carroll*, 108 F. App'x 291, 293-94 (6th Cir. 2004)(holding that a police officer who shoved an arrestee into a brick wall was not entitled to qualified immunity, because even if the officer were "reasonably mistaken about the legality of using some force to secure the area when he first arrived on the scene . . . . [he] had adequate time to assess the situation" and conclude that the arrestee did not present a "safety or flight risk").

Taking the facts in a light most favorable to Plaintiff, Officer Corrow is not entitled to qualified immunity. The precedent set forth above makes it clear that taking an arrestee to the ground who is not violent, resisting, or posing a threat to officers or the public violates clearly established law. Furthermore, the extent to which Plaintiff disputes Defendants' version of events makes granting summary judgment on the basis of qualified immunity inappropriate. "Summary judgment on

qualified immunity grounds is not appropriate when there are
facts in dispute that are material to a determination of
reasonableness." *Thomas,* 165 F.3d at 143; *see also Cowan ex rel.*
*Estate of Cooper v. Breen*, 352 F.3d 756, 764 (2d Cir.
2003)(holding that "[[b]ecause in this case genuine, material,
factual disputes overlap both the excessive force and qualified
immunity issues, summary judgment must be denied"); *Breen v.*
*Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) (holding that the
"the amount of force used, the injuries suffered and the
objective reasonableness of the officer's conduct" should be
left to a jury when the parties' stories differ considerably on
these issues and that those differences also bar summary
judgment on the basis of qualified immunity). In this case,
there are disputes of fact and those disputes are material and
genuine. Summary judgment therefore cannot be granted on the
basis of qualified immunity. **Defendants' motion for summary**
**judgment on Jok's excessive force claim is therefore denied.**
**III. State Law Claims**

Officer Corrow also moves for summary judgment on Jok's
state law claims of assault, battery, intentional infliction of
emotional distress and gross negligence. Vermont law defines
battery as an "intentional act that results in harmful contact
with another." *Christman v. Davis*, 889 A.2d 746, 749 (Vt. 2005).
This Court has held that "[w]hen assault and battery is alleged

against police officers, 'the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged.'" *Crowell,* 667 F. Supp. 2d at 417 (quoting *Smith v. District of Columbia*, 882 A.2d 778, 788 (D.C. 2005). While police officers can use force to lawfully arrest a suspect, *see Green v. City of New York*, 465 F.3d 65,86 (2d Cir. 2006), that privilege terminates when "the force used is excessive, which is determined using the same standards used to analyze a Fourth Amendment excessive force claim." *Mayo v. Winn*, No. S0952-05CNC, 2009 WL 8103582, at *6 (Vt. Super. May 14, 2009) (citing *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007)). Because Jok's assault and battery claims, like his excessive force claim, turn on a question of reasonableness which considering material disputed facts should be left to the jury, the **Court denies summary judgment on Jok's assault and battery claims.**

Officer Corrow also moves for summary judgment on Plaintiff's intentional infliction of emotional distress ("IIED") claim. IIED claims "require[] a plaintiff to establish 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *See Cook v. Arrowsmith Shelburne*, 69 F.3d 1235, 1242 (2d Cir. 1995)

(quoting *McHugh v. Univ of Vermont*, 758 F. Supp. 945, 949 (D. Vt. 1991)). A successful IIED claim is one that goes "beyond all possible bounds of decent and tolerable conduct in a civilized community." *Fromson v. State*, 848 A.2d 344, 347 (Vt. 2004). "A plaintiff's burden on a claim of IIED 'is a heavy one.'" *Dulude v. Fletcher Allen Health Care, Inc.,* 807 A.2d 390, 398 (Vt. 2002)(quoting *Gallipo v. City of Rutland,* 656 A.2d 635, 643 (Vt. 1994)); *see also Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1256 (Vt. 1995) ("The test is objective; the plaintiff must show that the harm resulting from the inflicted distress was so severe that no reasonable person could be expected to endure it."). The Vermont Supreme Court has "declined to find outrageous conduct based solely on the alleged illegal motives underlying the conduct." *Fromson v. State*, 848 A.2d 344, 349 (Vt. 2004). Furthermore, the inquiry into whether a jury could reasonably find that an officer's conduct was "so outrageous and extreme as to 'go beyond all possible bounds of decency'" is first a question of law for the court. *See Jobin v. McQuillen,* 609 A.2d 990, 993 (Vt. 1992) ("It is for the court to determine as a threshold question whether a jury could reasonably find that the conduct at issue meets the test.").

Plaintiff has not introduced evidence to demonstrate that Officer Corrow's use of force was "so outrageous . . . and so extreme . . . as to go beyond all possible bounds of decency."

*Demag v. Am. Ins. Companies*, 508 A.2d 697, 699 (Vt. 1986).
Additionally, there is no evidence in the record that suggests
that Officer Corrow intended to cause Jok emotional distress.
*See Beaudry v. McKnight,* No. 2:17-CV-23, 2019 WL 1296628, at *17
(D. Vt. Mar. 21, 2019) (holding that "Plaintiff's allegations
may be construed as claiming Officer McKnight caused him an
unspecified injury when Plaintiff was slammed into the open door
and back of a police cruiser . . . . Although a close question,
without additional factual content, the alleged conduct does not
satisfy the exacting standard required for an IIED claim under
Vermont law"). The Court therefore concludes Plaintiff has not
established facts that rise to the high standard for a
successful intentional infliction of emotional distress claim.
**As such the Court grants summary judgment on Jok's intentional
infliction of emotional distress claim**.

Officer Corrow also moves for summary judgment on
Plaintiff's gross negligence claim. To prove gross negligence
Plaintiff must demonstrate that "1)defendants owed a legal duty
to protect plaintiff from an unreasonable risk of harm;
2)defendants breached that duty; 3)defendants' conduct was the
proximate cause of plaintiffs' injuries; and 4) plaintiffs
suffered actual damage." *Knight v. Rower*, 742 A.2d 1237, 1242
(Vt. 1999). Gross negligence, however, is "more than an error of
judgment," rather it is a failure to exercise "even a slight

27

degree of care." *See Kennery v. State*, 38 A.3d 35, 64 (Vt. 2011)
(quotation marks omitted) (quoting *Hardingham v. United
Counseling Serv. Of Bennington Cnty.*, 672 A.2d 480, 482 (Vt.
1995)).

This Court previously found that a police department's use
of force policy could create a duty of care. *See MacLeod v. Town
of Brattleboro*, No. 5:10-CV-286, 2012 WL 5949787, at *10 (D. Vt.
Nov. 28, 2012) (holding that a police department's use of force
policy around the deployment of tasers could create a
governmental duty, because while the policy was formulated with
the goal of protecting the general public, "it is specifically
directed to police encounters with certain members of the
public"). This Court also noted that a use of force policy could
create a governmental duty because the threat of physical harm
in use of force incidents warrants guidance around these
policies, and because a plaintiff could reasonably rely on these
policies. *Id.*

Here, as in *MacLeod,* the use of force policy and its
specified expectations and limitations create a governmental
duty upon which Defendants owed Plaintiff a duty from
unreasonable risk of harm. *See id.* at *9 ("The question of
whether 'a duty exists upon which liability may be claimed is a
matter of law to be decided by the [c]ourt.'")(citing *Edson v.
Barre Supervisory Union No. 61*, 933 A.2d 200, 203 (Vt. 2007)).

This conclusion draws on the fact that the use of force policy, while written for the public at large, is directed at a subset of citizens who have encounters with the police. Furthermore, the use of force policy can be understood as a mechanism through which the Burlington Police Department protects police officers as well as citizens from harm by creating expectations around police-citizen interactions. Finally, a plaintiff could reasonably rely on these guidelines. The Burlington Police Department publishes and updates these guidelines and holds them out as a public document. Therefore, like in *MacLeod*, the Court concludes that Plaintiff has made a preliminary showing that the use of force policy in this case creates a duty.

The question as to whether Defendants breached that duty hinges on the reasonableness of Officer Corrow's actions. "Gross negligence is ordinarily a question of fact for the jury, and an allegation of gross negligence may be dismissed by the court only if reasonable minds cannot differ." *Kennery,* 38 A.3d at 64 (citing *Kane v. Lamothe*, 936 A.2d 1303, 1309 (Vt. 2007)). "Each case turns almost entirely on its own peculiar factual situation." *Langdon-Davies v. Stalbird*, 163 A.2d 873, 874-75 (Vt. 1960); *see also Garafano v. Neshobe Beach Club, Inc.*, 238 A.2d 70, 76 (Vt. 1967) (noting that questions around breach of care are "questions of fact . . . clearly for resolution by the jury"). As discussed above, the factual basis for the

reasonableness of Officer Corrow's actions is disputed.
**Therefore, summary judgment on Jok's state law gross negligence claim against Officer Corrow is denied.**

## IV. Supervisory Liability Claims

### A. Brandon Del Pozo

In their motion for summary judgment, Defendants argue that Plaintiff has not demonstrated Del Pozo's personal involvement in any of the alleged injuries in this case, and that he is entitled to summary judgment. Historically, the Second Circuit's decision in *Colon v. Coughlin* governed supervisory liability. *See* 58 F. 3d 865 (2d Cir. 1995). Under *Colon*, supervisory liability could be demonstrated by showing that:

> 1) the defendant participated directly in the alleged constitutional violation, 2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, 3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, 4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or 5) the defendant exhibited deliberate indifference to the rights of [persons] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 873 (quoting *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)). In *Ashcroft v. Iqbal*, the Supreme Court held that in supervisory liability cases, a plaintiff must prove that "each government-official defendant, through the official's own actions, has violated the Constitution." 556

30

U.S. 662, 676 (2009). *Iqbal* thus called the *Colon* factors into question. *See Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012) ("*Iqbal* has . . . engendered conflict within our Circuit about the continuing vitality of supervisory liability test set forth in *Colon* ....").

Recently, in *Tangreti v. Bachmann*, the Second Circuit clarified that a constitutional "violation must be established against the supervisory official directly." 983 F.3d 609, 618 (2020). While "the factors necessary to establish a [Section 1983] violation will vary with the constitutional provision at issue," *see id.* (quotation marks omitted) (citing *Iqbal*, 556 U.S. at 676), in *Tangreti* the Second Circuit held that to successfully plead an Eighth Amendment claim, a plaintiff must show that "conditions of confinement . . . pose an unreasonable risk of serious harm to their current or future health, and . . . that the defendant acted with deliberate indifference." *Id.* at 618-19 (quotation marks and citations omitted). Deliberate indifference means "the official must know[]of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference."

*Id.* (quoting *Vega v. Semple,* 963 F.3d 259, 272 (2d Cir. 2020)) (quotation marks omitted).

The extent to which *Iqbal* heightened the requirements of pleading other constitutional violations remains somewhat unresolved. *See Lombardo v. Graham*, 807 F. App'x 120, 124 n.1 (2d Cir. 2020) (acknowledging that "*Iqbal* may have heightened the requirements of supervisory liability" but declining to say to what extent). Nonetheless, while a supervisor cannot be found liable alone "by reason of . . . [his] supervision of others who committed the violation," *Tangreti*, 983 F.3d at 619, it seemingly remains possible for a policy maker to be held liable for their creation or continuance of an unconstitutional policy or custom. *See Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)(holding that post-*Iqbal*, "§ 1983 [still] allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy" which results in a violation of constitutional rights). To be held liable as a policymaker, a plaintiff must demonstrate that the defendant had the requisite *mens rea*, specifically that "the supervisor had subjective knowledge of a substantial risk of serious harm to a [person] and disregarded it." *Tangreti*, 983 F.3d at 616. "The focus is on what the *supervisor* did or what they caused to be done, the resulting injury attributable to his

32

conduct, and the *mens rea* required of him to be held liable."
*Id.* at 618 (quotation marks omitted). One court recently
concluded that "[r]eading *Tangreti* and . . . other decisions
together . . . a senior prison official can still be held liable
for his role in creating a policy . . . but . . . only if the
pleadings or record evidence 'permit the inference that [he] had
subjective knowledge of the risk of the sexual abuse inflicted
on [plaintiffs] and that [he] decided to disregard that risk.'"
*Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *9
(S.D.N.Y. Sept. 28, 2021) (citing *Tangreti*, 983 F.3d at 619).

Based on the current summary judgment record and viewing
the facts in a light most favorable to the Plaintiff, a
reasonable factfinder could conclude that Mr. Del Pozo knew
about the disparate use of force against Black citizens and
failed to act. For example, the Burlington Police Department
published a use of force report which analyzed data from 2012 to
2018. *See* Pls. Ex. 9.1. That report concluded that 20.9% of use
of force incidents were against Black people, a significantly
higher percentage than the number of Black residents in
Burlington (census data estimated the Black population of
Burlington at 5.7% in 2019; *see Meli et al. v. City of
Burlington, et al.,* Case No. 2:19-cv-71, ECF No. 144-31).[3] *See*

---

[3]Both parties in the *Jok* and *Meli* cases have admitted supporting
evidence. This order will therefore reference both records.

Pls. Ex. 9.1. Furthermore, while use of force incidents as a whole decreased from 2012-2018, the percentage of incidents of force against Black individuals increased over this time from ~17% in 2012 to ~25% in 2018. *See* Pls. Ex. 9.1. Del Pozo clearly was aware of the report's findings as he attested in his deposition that "as the Chief of Police . . . [he] was responsible for approving that report." *See* Pls. Ex. 21 at 33:6-9.

In 2017, Jay Diaz, a staff attorney from the Vermont Civil Liberties Union, wrote a letter to Mr. Del Pozo pointing out that "[BPD] officers have arrested and threatened multiple Burlingtonians, virtually all boys or men of color, in retaliation for their speech protected by the First Amendment to the United States Constitution . . . ." Diaz went on to cite multiple incidents where "all people of color, were each charged with disorderly conduct . . . [and] none of the accused used violence, force, or clear threats. Regardless of the appropriateness of their statements, they do not fit the definition of disorderly conduct." *See* Pls. Ex. 6.1 at 2. The letter concluded that the "arrests in these cases demonstrate a troubling pattern of Burlington police unlawfully retaliating in violation of individuals' First Amendment rights . . . " and that "[o]fficers have a range of options available to them to avoid such confrontations, including de-escalation tactics." *Id.*

34

at 3. The letter also detailed an incident where Burlington
police officers asked a group of men of color to leave the area
on Main Street outside of Nectar's Music for no apparent reason.
*Id.* at 1. When one of the men answered that "I know my rights"
and "fuck you" to the police officers, one officer said to
another, "[i]f he keeps going, I'll fucking knock his ass out."
*See id.* The officers proceeded to take that man to the ground,
pepper spray and arrest him, leaving him with lacerations on his
hands, legs, and neck. *Id.* at 2. In his deposition, Del Pozo
acknowledged that he remembered receiving the letter from the
ACLU. *See Meli et al. v. City of Burlington, et al.,* Case No.
2:19-cv-71, ECF No. 144-20 at 54:21.[4] Despite this notice, Del
Pozo does not remember having specific conversations with the
police officers under his supervision about "their threats to
knock someone out." *Id.* at 58:15-20.

Furthermore, Del Pozo supervised several officers whose
traffic stop patterns and use of force patterns arguably raised
concerns. A Burlington Police Department's Criminal Data
Analyst, Nancy Stetson, wrote in an email to Del Pozo that the
Department conducted 24 vehicle searches in 2018, 12 of which
were performed on Black people; nine of those 12 were conducted

---

[4] Both parties in the *Jok* and *Meli* cases have admitted Brandon Del
Pozo's deposition. However, the parties have admitted different
excerpts. This order will therefore reference both records.

by Officer Corrow. *See* Pls. Ex. 4.6. Furthermore, Del Pozo was aware of this disparity. Former Deputy Chief of Police Janine Wright testified in her deposition that she remembers having a conversation with Del Pozo regarding his concerns with the number of Black people Officer Corrow had pulled over. *See* Pls. Ex. 5.01 at 92:3-94:7. In another email to Del Pozo, Stetson noted that from the period from July 1, 2016 to the end of March 2019, Officer Campbell, a named defendant in the *Meli* lawsuit, was in the top 75% of officers for use of force incidents. *See* Pls. Ex. 4.2. Also, in *Meli*, Plaintiffs' expert Nader Hashim analyzed Sergeant Bellavance's use of force data finding that 25% of Bellavance's use of force incidents were committed against Black people (above average as compared to 20% for the Burlington Police Department as a whole). *See Meli et al. v. City of Burlington, et al.,* Case No. 2:19-cv-71, ECF No. 144-44 at 54:21.[5]

Additionally, University of Vermont Professor Stephanie Seguino and Cornell University Professor Nancy Brooks conducted a statewide analysis of racial disparities in traffic policing titled "Driving While Black and Brown in Vermont." *See* Pls. Ex. 8.3. Published in 2017, the report estimated that "Black drivers

---

[5] Both parties in the *Jok* and *Meli* cases have admitted use of force data. However, the parties have admitted different excerpts. This order will therefore reference both records.

are stopped at [a] rate that is between 161% and 193% of their population share." *Id.* at 29. *Id.* at 29. The report also concluded that the Black arrest rate statewide is almost double the White arrest rate. *Id.* Plaintiff submits that these findings are relevant to disparities in the use of force. Plaintiff's expert Seguino stated in her deposition that "based on the analysis that we have done of traffic stop data that demonstrate ... differential treatment based on race, it is a reasonable assumption that if there are biased behaviors in traffic stops, there are biased behaviors in other interactions with citizens." *See Meli et al. v. City of Burlington, et al.,* Case No. 2:19-cv-71, ECF No. 144-32 at 55:6-12.[6] Furthermore Seguino and Brooks acknowledged in a follow-up study, which assessed traffic stop data in Burlington from 2014-2019, that "[t]o the extent we observe disparities in traffic stops, we may be able to identify racial disparities and bias that are not so easy to discern with events that occur less frequently or for which bias is difficult to measure empirically." *See Meli et al. v. City of Burlington, et al.,* Case No. 2:19-cv-71, ECF No. 144-33 at 8 (noting that "[a]s an example, there are wide racial disparities in use of

---

[6] Both parties in the *Jok* and *Meli* cases have submitted Professor Seguino's findings. However, the parties have admitted different excerpts. This order will therefore reference both records.

force and arrests rates, but these events occur much less frequently than traffic stops)." See *id.* at 8 n.7.

Finally, it is clear that Del Pozo was aware of the disproportionate effect of policing on the Black community. At a city council meeting, Del Pozo acknowledged "that the use of force by his Department has a disproportionate impact on African Americans," *see* Pls. Ex. 20.2 at 1:02:40, and that the "ACLU was right." See *id.* at 01:07:05.

A reasonable factfinder could conclude that given the use of force data, traffic stop data, and the ACLU letter, Mr. Del Pozo was on notice of the disproportionate use of force against Black citizens within the police department he supervised and despite that notice, he failed to take action. A reasonable jury could further conclude that notice coupled with inaction constitutes deliberate indifference. **For the reasons stated above, the summary judgment on Plaintiff's supervisory liability claim against Mr. Del Pozo is denied.**

Plaintiff also brings a state law negligent supervision claim against Mr. Del Pozo. When pleading a negligent supervision claim, a plaintiff must demonstrate an employer's knowledge of misconduct, that the misconduct was foreseeable, that the employer owed a duty to plaintiff, and that that duty was breached. *Rudavsky v. City of South Burlington*, No. 2:18-CV-25, 2018 WL 4639096, at *6-7(D. Vt. Sept. 27, 2018). The

questions of knowledge and foreseeability "should be viewed in the context of the alleged pattern, practice, and/or policy with respect to the use of excessive force" because "if, as alleged, [the police] had a practice of overlooking or downplaying incidents of excessive force . . . then it was foreseeable that officers would be inclined to use such force without fear of discipline." *See id.* at *6 (declining to dismiss a negligent supervision claim against the city of Burlington for alleged excessive force by its officers). Taking the facts in the light most favorable to plaintiff, a factfinder could conclude that Defendant Del Pozo knew about misconduct, that misconduct was foreseeable, and that he owed a duty to Plaintiff. *See also id.* at *7 (noting that "when a detainee has been taken into custody and is, for example, handcuffed, he is unable to defend himself from attack and is owed a duty of protection by his custodian"). Because the Court has denied summary judgment for the supervisory liability claim against Mr. Del Pozo, the Court also denies summary judgment on the negligent supervision claim for the reasons stated above. *See LaFaso v. LaFaso*, 223 A.2d 814, 819 (Vt. 1966); *see also Garafano v. Neshobe Beach Club, Inc.*, 238 A.2d 70, 76 (Vt. 1967) (noting that questions around breach of care are "questions of fact . . . clearly for resolution by the jury"). **The City's motion for summary judgment on the**

**negligent supervision claim against Del Pozo is therefore denied.**

### B. Janine Wright

Plaintiff also brings a Section 1983 claim against former Deputy Chief of Police Janine Wright. As discussed above, supervisory liability requires that a constitutional "violation must be established against the supervisory official directly." *Tangreti*, 98 F.3d at 618. There is no allegation here that Ms. Wright participated directly in the use of force. Furthermore, Plaintiff has not established facts to demonstrate that Ms. Wright had subjective knowledge of the constitutional violations occurring in the Burlington Police Department and the risk of harm to Plaintiff and that she was deliberately indifferent to that risk. Unlike his claim against Defendant Del Pozo, Plaintiff has not provided evidence that notice of these violations was addressed directly to Ms. Wright beyond suggesting that she was on a Burlington Police Department email listserv and was sent a report about disparate impact based on race in traffic stops. This alone does not meet the demanding requirement that Defendant Wright knew that the type of harm from which Plaintiff suffered was occurring and that she was deliberately indifferent to that risk of harm. **Summary judgment on the supervisory liability claim against Ms. Wright is therefore granted.**

Plaintiff also brings a state law negligent supervision claim against Janine Wright. As discussed above, because the Court granted summary judgment for the federal supervisory liability claim, the Court also grants summary judgment for Ms. Wright on the negligent supervision claim. Negligent supervision requires an employer's knowledge of misconduct, that the misconduct was foreseeable, that the employer owed a duty to plaintiff, and that that duty was breached. *Rudavsky*, 2018 WL 4639096, at *6-7. That is, insofar as Plaintiff has failed to establish that Ms. Wright violated his constitutional rights, he has also not established facts to meet the requirements of negligent supervision. **Summary judgment is granted on the negligent supervision claim against Ms. Wright.**

### C. Sergeant Bellavance

Plaintiff also brings a Section 1983 claim against Sergeant Bellavance. As discussed regarding Defendant Wright, Plaintiff has not set forth facts to demonstrate that Sergeant Bellavance had subjective knowledge of the constitutional violations occurring in the Burlington Police Department, the risk of harm to Plaintiff, or deliberate indifference to that risk. Furthermore, Plaintiff has not established any facts suggesting that Sergeant Bellavance's training of officers was deficient beyond suggesting that officers did not know how to handle situations where one person is fighting another, or even that it

was Sergeant Bellavance's job to train and sanction officers.
While Plaintiff does submit that Sergeant Bellavance was Officer
Corrow's direct supervisor and thus he should have known about
Corrow's disparate use of force, Plaintiff has failed to set
forth facts suggesting Sergeant Bellavance had subjective
knowledge of constitutional violations and was deliberately
indifferent to the risk of a constitutional violation.  **Summary
judgment on the supervisory liability claim against Sergeant
Bellavance is thus granted.**

Plaintiff also brings a state law negligent supervision
claim against Sergeant Bellavance. As discussed above, because
the Court has granted summary judgment for the federal
supervisory liability claim, it **also grants summary judgment for
Sergeant Bellavance on the negligent supervision claim.**

## V. *Monell* Claims against Defendant City of Burlington

Under *Monell*, a municipality can be held liable in cases
where the injury suffered by a plaintiff arises from the
municipality's customs or policies." *Monell v. Dep't of Social
Services*, 436 U.S. 658, 694 (1978). This "policy, custom or
practice" can be met in four ways. *See Webster v. City of New
York*, 333 F. Supp. 2d 184, 205. (S.D.N.Y 2004). Plaintiff can
demonstrate (1) evidence of a formal policy adopted by the
municipality, *see Monell*, 436 U.S. at 690; (2) actions taken by
policy makers that caused the constitutional deprivation, *see*

42

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986); (3) a practice "so permanent and well settled as to constitute a custom or usage . . . ," *see Monell*, 436 U.S. at 690-91 (quotation marks omitted); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (noting that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy"); and (4)failure to train and supervise by policy makers which constitutes deliberate indifference to the constitutional rights of those affected. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

### A. Fourteenth Amendment *Monell* Claim

Plaintiff alleges that the Burlington Police Department allowed a pattern of behavior to develop involving the unlawful use of force against minorities in violation of the Fourteenth Amendment. A successful claim under the Fourteenth Amendment requires a plaintiff to allege that a state actor intentionally discriminated on the basis of race. *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000). A plaintiff can allege this by identifying a policy that "expressly classifies persons on the basis of race," *see Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999), or a plaintiff can identify a facially neutral policy that is motivated by racial

43

animus or applied in an intentionally discriminatory manner. *See Yick Wo v. Hopkins*, 118 U.S. 356 (1986); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977). While Plaintiff points to a disparate impact on Black citizens in the use of force, he has supplied no evidence that the City's policy was intentionally discriminatory or that it was motivated by racial animus. For support, Plaintiff cites social media posts to purportedly show that leadership within the Burlington Police Department was motivated by racial animus. While this evidence may call into question the actions of certain individuals, it does not allege that the Department applied its use of force policy in an intentionally discriminatory manner. **Summary judgment on Plaintiff's Fourteenth Amendment claim against the City of Burlington is therefore granted.**

**B. Fourth Amendment *Monell* Claim**

Plaintiff alleges that Defendant City of Burlington failed to properly train, supervise, and discipline its officers resulting in violation of Plaintiff's Fourth Amendment rights. In their motion for summary judgment, Defendants argue that Plaintiff's *Monell* claim against the City of Burlington fails because Plaintiff has failed to identify specific deficiencies in the City's training that led to their alleged constitutional violations. Furthermore, Defendants argue that Plaintiff has not

44

produced any evidence suggesting the City of Burlington was deliberately indifferent to a pattern of Fourth Amendment violations.

First, a reasonable factfinder could conclude that the City of Burlington's decision to hire Brandon Del Pozo as Chief of Police despite being aware of his academic writing suggests deliberate indifference. In that published writing, Del Pozo "argu[es] against [the] quick dismissal of racial profiling, writing that in some instances it is a legal, ethical and useful tool for policing," and comments on the criminality of Black offenders:

> NCVS data, [where] individual blacks are 50 times more likely to commit crimes against whites than vice-versa; groups of blacks are up to 250 times as likely to do so. In fact, NCVS data suggests that blacks are responsible for 90% of all violent interracial crime. What this implies is that in racially-mixed situations, blacks account for the vast majority of violent, interracial crime. A further implication is that if the police are patrolling such areas populated by a mix of white and black citizens, the sub-group of blacks among them contains significantly more criminals.

Pls. Ex. 25 at 7. Furthermore, a reasonable factfinder could conclude that Former Chief of Police Brandon Del Pozo's remarks, coupled with use of force data and traffic stop data discussed above, which suggests Black citizens were disparately impacted by Burlington police interactions, as well as a ACLU letter notifying the city of a "disturbing pattern … [of] arresting and

charging men of color with disorderly conduct," all put Defendant City of Burlington on notice of constitutional violations.

Specifically, under *Monell's* second factor, a reasonable factfinder could conclude that injuries suffered by Plaintiff in this case were a result of inadequate or non-existent policies around racial bias training and the higher use of force and arrest rates against Black citizens. Under *Monell's* third factor, a reasonable fact finder could conclude that the City of Burlington permitted a widespread practice of permitting higher use of force against Black citizens, as evidenced by use of force reports, the ACLU letter addressed to the Burlington Police Department, other lawsuits, news articles and academic studies. Finally, under *Monell's* fourth factor, a reasonable factfinder could conclude that the City of Burlington failed to provide adequate training and supervision of subordinates on racial bias and racial animus, to the extent that it amounted to deliberate indifference to the rights of those who can into contact with the municipal employees. In sum, a reasonable factfinder could also conclude that Defendant City of Burlington's failure to remedy these violations, and its failure to train and supervise its employees, amounted to deliberate indifference to Plaintiff's Fourth Amendment rights.

In the alternative, Defendants argue that Plaintiff's
*Monell* claim should be denied because "Plaintiff has not
identified a witness qualified to provide expert opinion
testimony regarding the statistics compiled by Defendant
Burlington." *See* ECF No. 205 at 33-34 (referring to the use of
force statistics provided by the Burlington Police Department).
In doing so, Defendants cite *Floyd v. City of New York*, 959 F.
Supp. 2d 540, 577 (S.D.N.Y. 2013) as a case "discussing reasons
witness was not qualified to testify as expert regarding
statistics." *See* ECF No. 205 at 34. Defendants' argument fails
for several reasons.

First, while Defendants argue that Plaintiff has not
identified an expert to interpret the statistics it seeks to
introduce, Defendants do not directly claim that expert
testimony is required to determine whether a custom or policy
meets the *Monell* standard.  Furthermore, while the case upon
which Defendants rely, *Floyd v. City of New York,* does include
an extensive discussion of expert methodology and testimony in
that case, it does not hold that expert testimony is necessary
for a *Monell* claim.

Second, and most importantly, case law suggests that a
plaintiff can survive summary judgment without having identified
an expert if they have other evidence to support their claim.
While the Second Circuit has not definitively said whether an

expert is required to survive summary judgment on a *Monell* claim, it has upheld several *Monell* claim verdicts without the use of expert testimony related to city or department policies. *See Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992) (holding that contrary to the district court's evaluation, plaintiff had introduced "sufficient evidence from which the jury could reasonably infer an unconstitutional NYPD practice of sex discrimination); *Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 331 (2d Cir. 1986) ("Drawing all reasonable inferences in favor of [plaintiff], the jury could rationally have concluded that during the two years prior to [plaintiff's] arrest, the City defendants' response to complaints of use of excessive force by City police officers was uninterested and superficial. . . . reflecting an indifference by the City to the use of excessive force."); *see also Okin v. Vill. of Cornwall-On-Hudson Police Dep't,* 577 F.3d 415, 441 (2d Cir. 2009) (denying summary judgment on municipal liability claims without mentioning expert testimony). In all those cases, the Court either denied summary judgment or upheld a verdict without mention of the use of expert testimony.

In *Sorlucco*, for example, the plaintiff submitted a statistical study prepared by the New York Police Department ("NYPD") tracking disciplinary action taken against probation officers as evidence. *See Sorlucco*, 971 F.2d at 871. The court

in that case disagreed with the district court's conclusion that the study was statistically insignificant. *Id.* at 872. In doing so, it reasoned that the plaintiff "presented ample facts concerning her treatment at the hands of her superiors from which the jury, in conjunction with the statistical evidence, could have reasonably inferred that there was a custom of sex bias operating within the NYPD" and it "believe[d] that . . . [plaintiff's] evidence concerning her 'personal experiences with the [NYPD] brought the cold numbers convincingly to light,' ... at least to the extent where the jury could rationally reach the result it d*id*." *Id.* at 872. This conclusion was made all without any mention of expert testimony.

In another case, *Lucente v. County of Suffolk*, six female inmates claimed that the county had a custom or practice of ignoring or inadequately addressing a correction officer's sexual misconduct with inmates. 980 F.3d 284, 288 (2d Cir. 2020). The district court granted summary judgment for the county and the Second Circuit reversed, holding that plaintiff's evidence raised genuine issues of fact as to whether the county had a custom or practice of ignoring a correctional officer's sexual misconduct with inmates. *Id.* In reaching this conclusion, that court did not analyze the requirement for expert testimony per se, but no expert testimony was mentioned at all. This suggests that expert testimony was not part of the case, and

that it was not required for plaintiff to survive summary judgment.

Finally, in *Okin*, relying on "more than a dozen contacts between . . . [plaintiff] and the Village" the Court noted that, "[plaintiff's] claim of municipal liability . . . focused on the Village's alleged failure-to-train, is fairly construed to articulate a claim that the Village had a custom whereby it acquiesced in unconstitutional conduct by its officers" and that "[t]hese incidents suggest a consistent pattern of failing to adequately respond to . . . [plaintiff's] complaints, to implement the New York mandatory arrest statute, to interview the alleged abuser, or to file domestic incident reports, a pattern which may have encouraged further violence." 577 F.3d at 439-40 (citing *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir. 1995) ("[D]eliberate indifference may be inferred if . . . complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.")).

Additionally, several other circuits have upheld *Monell* claims without expert testimony. *See e.g.*, *Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 696 (10th Cir. 1988) (allowing the admission of arrest rate statistics with no mention of an expert interpretation because "[w]hen all of the plaintiff's evidence is considered, it is sufficient, if believed, to

support a jury finding that the City and Police Department followed a policy or custom of affording less protection to victims of domestic violence than to victims of nondomestic attacks"). Furthermore, the Third Circuit has definitively said that expert testimony is not necessarily required to uphold a *Monell* verdict. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 973-75 (3d Cir. 1996) (holding that because a jury could infer from numerous complaints that the police department knew of an officer's violence and failed to investigate those claims, it allowed a custom of excessive force and the district court erred in granting summary judgment; the court further held that expert testimony was not required to show deficiencies in procedures so as to hold the city liable). In *Beck*, the court reasoned that "[a]s for drawing inferences from the evidence regarding the adequacy of the investigatory process . . . '[t]o require expert testimony to prove this fact is ridiculous. It is not beyond the ken of an average juror to assess what a reasonable municipal policymaker would have done with the information in this case'"). *Id.* at 975-76.

Taken together, these holdings suggest that expert testimony is not required to survive summary judgment on a *Monell* Claim. The Court therefore rejects Defendants' argument that Plaintiff's claim should be dismissed for want of expert

51

testimony. **Summary judgment on the Fourth Amendment *Monell* Claim against Defendant City of Burlington is thus denied.**

## VI. Municipal Liability State Law Claims

### A. Vicarious Liability for Negligence

While Plaintiff concedes that his § 42 U.S.C 1983 claims against Officer Corrow preclude the City of Burlington from respondeat superior liability, *see Monell*, 436 U.S. at 691, he argues that his state law supervisory liability claims face no such restriction. Under Vermont state law, an employer can be held liable for torts committed by its employees when done in the scope of employment. *See Brueckner v. Norwich Univ.,* 730 A.2d 1086, 1090 (Vt. 1999). Conduct is considered to be within the scope of employment when "(a) it is of the kind the servant is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) in a case in which the force is intentionally used by the servant against another, it is not unexpectable by the master." Restatement (Second) of Agency § 228(1) (1958). Furthermore, the claims against the City of Burlington are derivative of the claims against Officer Corrow. Therefore, because the Court has declined to dismiss the claims against Officer Corrow, it also declines to dismiss the claims against the City. *See Winfield v. State*, 779 A.2d 649, 653 (Vt. 2001) ("Plaintiff's claims against

the State are derivative of the tort claims against the individual defendants. Since we have held that the conduct complained of . . . failed to violate any established rights to which plaintiff was entitled, we discern no basis for the claims against the State."). Because the Court has established that the claims against Officer Corrow are not entitled to summary judgment, the same is true of the supervisory liability claim against the City. *See id.* **Therefore, summary judgment on Jok's claim against Defendant City of Burlington for its supervision of Officer Corrow is denied.**

#### B. Negligent Supervision

Plaintiff also argues that Defendant City of Burlington's failure to train, supervise, discipline and sanction officers amounts to negligence in violation of Vermont State law. As discussed above, when pleading a negligent supervision claim, a plaintiff must demonstrate employer's knowledge of misconduct, that the misconduct was foreseeable, that the employer owed a duty to Plaintiff, and that that duty was breached. *Rudavsky*, 2018 WL 4639096, at *6-7. Taking the facts in a light most favorable to Plaintiff, a factfinder could conclude that City of Burlington knew about misconduct, that misconduct was foreseeable, and that it owed a duty to plaintiff. The Court uses the same reasoning here that it did when denying summary judgment on the negligent supervision claim against Mr. Del

Pozo. **The City's motion for summary judgment on the negligent supervision claim is thus denied.**

**Conclusion**

For the reasons set forth above, Defendants' Motion for Summary Judgment on Jok's claims against Officer Corrow is **GRANTED** as to his IIED claim and **DENIED** as to the remainder of his claims. Defendants' Motion for Summary Judgment on Plaintiff's *Monell* claim is **GRANTED** as to the 14th Amendment claim and **DENIED** as to the 4th Amendment claim. Defendants' Motion for Summary Judgment on Plaintiff's supervisory liability claims against Defendant Wright and Bellavance is **GRANTED.** Defendants' Motion for Summary Judgment on Plaintiff's supervisory liability claim against Defendant Del Pozo is **DENIED.** Defendants' Motion for Summary Judgment on Plaintiff's supervisory liability claims against the City is **DENIED.**

DATED at Burlington, in the District of Vermont, this 14th day of February, 2022.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge